**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| **v.** | : | **CRIMINAL NO. 3:23-cr-26** |
| **HOWARD BELL, KEVIN JONES,** | : | **(JUDGE MANNION)** |
| **and RAHMEL WIGFALL** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Defendant Howard Bell has filed an omnibus motion for pretrial relief, in which his co-defendant Kevin Jones joins in part. Defendant Rahmel Wigfall has also filed a motion to dismiss the government's information of prior convictions and has moved to adopt Defendant Bell's brief in support of Bell's motion to dismiss the government's information of prior convictions.

**BACKGROUND**

Defendants are three of fifteen against whom a grand jury returned an Indictment in February 2023. (Doc. 1). The Indictment charges all with conspiring to possess and distribute controlled substances, in violation of 21 U.S.C. §846 (Count I). It charges Defendants Bell and Wigfall with possession with intent to distribute and distribution of a controlled substance,

in violation of 21 U.S.C. §841(a)(1) (Counts 4 & 5). It further charges that before Bell and Wigfall committed the offense charged in Count I, they each had final convictions for serious drug felonies in Pennsylvania for which they served more than 12 months of imprisonment and for which they were released from imprisonment within 15 years of the instant charged offenses. The government has filed informations of these prior convictions. (Doc. 128; Doc. 130).

Defendants Bell and Wigfall recognize that conviction for a federal drug offense after having been convicted for 2 serious drug felonies in Pennsylvania would subject them to a 25-year mandatory minimum sentence under 21 U.S.C. §841(b)(1)(A). So they move to dismiss the government's informations of prior convictions, arguing that their Pennsylvania convictions do not qualify as "serious drug felonies" under federal law. (Doc. 346; Doc. 391).

Defendant Bell's second motion, which Defendant Jones joins, requests that the court order the government to identify, among the materials it has already produced, exculpatory evidence and evidence which it plans to offer in its case-in-chief. In their third and fourth motions, Defendants Bell and Jones seek discovery of any statements of coconspirators which the government intends to offer as evidence excluded from the rule against

hearsay and request that the court hold a hearing to determine whether a conspiracy existed before admitting such statements.

The fifth and final motion, brought only by Defendant Bell, requests suppression of evidence found in packages seized by postal authorities, on the basis that this evidence was obtained in violation of the Fourth Amendment.

The court addresses these motions in order.

## I.  MOTION TO DISMISS INFORMATIONS OF PRIOR CONVICTION

Defendants Bell and Wigfall first move for a ruling that their prior Pennsylvania convictions cannot subject them to 21 U.S.C. §841(b)(1)(A)'s 25-year mandatory minimum sentence and for dismissal of the government's informations of these prior convictions. (Doc. 128; Doc. 130). By these informations, filed pursuant to 21 U.S.C. §851(a), the government expressed its intention to rely on Defendants' prior Pennsylvania convictions in support of this mandatory minimum sentence for the offenses charged in the Indictment.

Bell was convicted in 2006 in the Luzerne County Court of Common Pleas for violations of 35 Pa. Stat. Ann. §780-113(a)(30), which prohibits "the

manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance by a person not registered under [The Controlled Substance, Drug, Device and Cosmetic Act]." (Case Nos. CP-40-CR-0000858-2006; CP-40-CR-860-2006). He was separately convicted for another violation of §780-113(a)(30) the same year, also in Luzerne County. (Case No. CP-40-CR-0001157-2006). Defendant Wigfall has three final convictions under §780-113(a)(3) in Lackawanna and Luzerne Counties, from 2009, 2014, and 2016. (Case Nos. CP-40-CR-2336-2009; CP-35-CR-282-2014; CP-35-CR-2304-2016). All these convictions were for possession with intent to deliver heroin. (Doc. 348-2; Doc. 391).

A person who commits a violation of 21 U.S.C. §841(a) involving more than certain amounts of a controlled substance "after 2 or more prior convictions for a serios drug felony … have become final … shall be sentenced to a term of imprisonment of not less than 25 years." §841(b)(1)(A).

The Controlled Substances Act defines "serious drug felony" as "an offense described in section 924(e)(2) of Title 18 for which—(A) the offender served a term of imprisonment of more than 12 months; and (B) the offender's release from any term of imprisonment was within 15 years of the instant offense. 21 U.S.C. §802(57). Section 924(e)(2), in turn, defines

"serious drug offense" to include "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. §802)), for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. §924(e)(2)(A)(ii).[1] Defendants do not dispute that they served terms of imprisonment for their Pennsylvania convictions exceeding 12 months and were released within 15 years of the instant charged offense. But they assert that those convictions cannot subject them to the 25-year mandatory minimum because 35 Pa. Stat. Ann. §780-113(a)(30) prohibits a broader range of conduct than §924(e)(2)(A)(ii)'s "serious drug offense" encompasses.

In short, their argument is this: Because Pennsylvania law controls all isomers of heroin, but the CSA schedules (to which §924(e)(2)(A)(ii)

---

[1] Section 924(e)(2)(A)(ii)'s specific reference to the CSA's controlled substance schedules stands in contrast to, for example, the United States Sentencing Guidelines career-offender provision, USSG §4B1.1, which establishes sentencing enhancements for persons convicted of a felony crime of violence or controlled substance offense who have two prior felony controlled substance offenses. There, "controlled substance" is *not* defined by the CSA schedules. USSG §4B1.2(b)(1). Owing in part to this absence of a specific CSA cross-reference, the Third Circuit has concluded that "a 'controlled substance' within the §4B.1(b) definition of a 'controlled substance offense' is one regulated by *either* federal or state law." *United States v. Lewis*, 58 F.4th 764, 769 (3d Cir. 2023).

"serious drug offense" refers) control only the optical isomers, a Pennsylvania heroin conviction does not necessarily involve a CSA-controlled substance (because it could involve a "non-optical" isomer of heroin) and so cannot serve as a 21 U.S.C. §841(b)(1)(A) predicate "serious drug offense."

### 1. Legal Standard

To determine whether a previous state conviction qualifies as a predicate offense under federal criminal law, the court must apply the "categorical approach." *United States v. Aviles*, 938 F.3d 503, 511 (3d Cir. 2019).[2] The parties agree generally that the categorical approach applies, but the government asserts that Defendants apply the wrong version of it.

Traditionally, this approach "involves comparing 'the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime—*i.e.*, the offense as commonly understood.'" *United States v. Henderson*, 841 F.3d 623, 627 (3d Cir. 2016) (quoting *Descamps*

---

[2] *Aviles* dealt with the previous version of 21 U.S.C. §841(b)(1)(A), which mandated life imprisonment for those convicted after having previously been convicted of two or more "felony drug offenses." 938 F.3d at 511. The First Step Act of 2018 "lowered the statutory minimum sentences and substituted the predicate conviction for enhanced sentences from a 'felony drug offense' to either a 'serious drug felony or serious violent felony.'" *United States v. Zayas*, 32 F.4th 211, 230 (3d Cir. 2022); P.L. 115-301, Dec. 21, 2018, 132 Stat. 5194.

*v. United States*, 570 U.S. 254, 257 (2013)). The court "look[s] only to the statutory definitions—*i.e.*, the elements—of a defendant's prior offenses, and *not* to the particular facts underlying those convictions." *Id.* (quoting *Descamps*, 570 U.S. at 261). To be a predicate offense, the elements of the statute of conviction must be "the same as, or narrower than, those of the generic offense." *Id.* (quoting *Descamps*, 570 U.S. at 257).

Two variations are required here. First, comparison to a "generic" federal offense is inappropriate, because §§841(b)(1)(A) and 924(e)(2)(A)(ii) refer not to a particular crime (like "burglary"), but to certain criteria. So we simply ask whether the statute of conviction satisfies those criteria. *See Shular v. United States*, 589 U.S. 154, 158–59 (2020). Second, because the statute of conviction (§780-113(a)(30)) is "divisible," *United States v. Brown*, 47 F.4th 147, 150 n.1 (3d Cir. 2022), meaning it "contains alternative elements," we apply the "modified categorial approach." *Aviles*, 938 F.3d at 511. Under this approach, the court "looks to a limited class of documents (for example, the indictment, jury instructions, or plea agreement and colloquy) to determine what crime, with what elements, a defendant was convicted of." *Mathis v. United States*, 579 U.S. 500, 505 (2016). "The court can then compare that crime" to the federal criteria. *Id.*

More specifically, the modified categorical approach, as applied to the divisible 35 Pa. Stat. Ann. §780-113(a)(30)—under which the particular controlled substance used is an element of the crime, *Henderson*, 841 F.3d at 629–31—requires that we determine first which controlled substance(s) formed the basis of Defendants' convictions. And the *Shular* approach here requires that Defendants' offense of conviction involve "manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" as defined by the CSA. 18 U.S.C. §924(e)(2)(A)(ii).

The government notes that Defendants do not cite *Shular*, and implies that they fail to apply its approach. (Doc. 394 at 5–7). While Defendants do not specifically distinguish between the traditional "generic offense" approach and the *Shular* approach, neither do they attempt to extract from §924(e)(2)(A)(ii) a "generic" drug offense; they simply argue that §780-113(a)(30) "covers a larger swath of conduct than its federal counterpart." (Doc. 347 at 11). In light of *Shular*, their phrasing arguably could have been more precise, but to say that this argument applies the wrong standard would be purely semantic. Defendants compare §780-113(a)(30) with §924(e)(2)(A)(ii)'s requirement that the state-law offense "involve[] manufacturing, distributing, distributing, or possessing with intent to

manufacture or distribute, a controlled substance" as defined by the CSA—which is the comparison *Shular* requires.

To the extent the government equates the *Shular* approach to the "looser categorical approach" recognized by *United States v. Portanova*, 961 F.3d 252, 257 (3d Cir. 2020), (Doc. 394 at 5 & n.3), that approach has so far been applied only to statutes with specific broadening language. That is, where a federal statute creating a mandatory minimum sentence encompasses state convictions "relating to" certain conduct,[3] the Third Circuit has not required "a precise match between the federal generic offense and the state offense elements." *Id.* Instead, "[t]he phrase 'relating to' must be read expansively and encompasses crimes other than those specifically listed in the federal statutes." *Id.*; *United States v. Jackson*, No. 3:20-CR-291, 2023 WL 2816853, at *5 (M.D. Pa. Apr. 6, 2023) (addressing 21 U.S.C. §841(b)(1)(C)'s requirement of a "prior conviction for a felony drug offense," which term is defined by §802(44) as "an offense … under any law … of a State … that prohibits or restricts conduct relating to narcotic drugs"); *United States v. Rosario*, No. 3:21-CR-206, 2023 WL 7112837, at **2–3 (M.D. Pa.

---

[3] *See, e.g.,* 18 U.S.C. §802(44) ("an offense … under any law of the United States or of a State or foreign country that prohibits or restricts conduct relating to narcotic drugs …."); 18 U.S.C. §2252(b)(1) ("prior conviction … under the laws of any State relating to … possession … of child pornography ….").

Oct. 27, 2023) (same). Here, we consider 21 U.S.C. §841(b)(1)(A)'s "serious drug felony," which, by way of §802(57) and 18 U.S.C. §924(e)(2)(A)(ii), is defined as an offense "*involving* manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance." (emphasis added). Unlike the statutory definitions at issue in *Portanova*, *Jackson*, and *Rosario*, the "serious drug felony" definition does not use the "relating to" language.

Even assuming that the "looser categorical approach" is triggered by the "involving" language used here, a further, more strained extension would be required to read "involving" expansively with respect to the *controlled substance* used in the state conviction. *Portanova* addressed 18 U.S.C. §2252(b)(1), which establishes a mandatory minimum sentence for those convicted of certain federal offenses involving sexual exploitation of minors after having a prior conviction under state law "relating to," among other things, the "possession … of child pornography." The Third Circuit contrasted this statute, which it determined triggered the "looser categorical approach," to those containing "limiting language that strictly refers only to conduct criminalized under federal law." 961 F.3d 252 at 257. It also distinguished §2252(b)(1) from 8 U.S.C. §1227(a)(2)(B)(i), which makes deportable "[a]ny alien who," after admission into the United States, is convicted of a violation

of a state law "relating to a controlled substance (as defined in section 802 of Title 21)." In *Mellouli v. Lynch*, 575 U.S. 798 (2015), the Supreme Court rejected the argument that, under §1227(a)(2)(B)(i), "*any* drug offense renders an alien removable, without regard to the appearance of the drug on a [21 U.S.C.] §802 schedule." It reasoned instead that "construction of §1227(a)(2)(B)(i) must be faithful to the text, which limits the meaning of 'controlled substance' … to the substances controlled under §802," and so "to trigger removal under §1227(a)(2)(B)(i), the Government must connect an element of the alien's conviction to a drug 'defined in §802.'" 575 U.S. at 813. The Third Circuit in *Portanova* reasoned that because §2252(b)(1) "lacks the removal statute's express limiting parenthetical," *Mellouli* did not there foreclose application of the "looser categorical approach." 961 F.3d at 259.

To stretch *Portanova* to permit a reading of 18 U.S.C. §924(e)(2)(A)(ii) that includes substances *not* within 21 U.S.C. §802(6)'s definition of "controlled substance" would run up against *Mellouli*, because §924(e)(2)(A)(ii), like 8 U.S.C. §1227(a)(2)(B)(i), specifically limits the

meaning of "controlled substance" to those controlled under the CSA schedules.[4]

---

[4] At first glance, it might appear that this court did countenance such an extension in *Jackson*, 2023 WL 2816853, at *5. There, the defendant, who was convicted of multiple controlled substances offenses under 21 U.S.C. §841 and who had a prior felony conviction for possession with intent to distribute cocaine within 500 feet of Public Housing under N.J. Stat. §2C:35-7.1(a), argued that his New Jersey conviction could not subject him to §841(b)(1)(C)'s mandatory life imprisonment for those with a prior "felony drug offense" conviction whose §841 violation involved a schedule I or II controlled substance and resulted in death or serious bodily injury, because New Jersey's definition of cocaine included ioflupane while the federal definition did not. 2023 WL 2816853, at *2.

"Felony drug offense" includes state law offenses prohibiting "conduct relating to narcotic drugs," and "narcotic drug" includes "cocaine, its salts, optical and geometric isomers, and salts of isomers," without specific reference to the CSA's drug schedules. 21 U.S.C. §802(17), (44). Because of "the absence of an express reference to the CSA schedules in the definition of narcotic drugs," the court reasoned that Schedule II's removal of ioflupane did not change §802(17)'s definition of "narcotic drug." 2023 WL 2816853, at *5. It further reasoned that, even assuming that New Jersey's definition of cocaine *were* broader than §802(17)'s, *Portanova*'s "looser categorical approach" directed it to read §802(44)'s "relating to" language "expansively," to determine whether the New Jersey offense of conviction "related to" "narcotic drugs." *Id.* The court concluded that it did. *Id.* But again, "narcotic drugs," unlike 18 U.S.C. §924(e)(2)(A)(ii)'s "serious drug offense," does not contain a specific reference to the CSA schedules, so *Mellouli* posed less of an obstacle to the expansive interpretation embraced in *Jackson* than it does here. *See Rosario*, 2023 WL 7112837, a *2 ("The distinction between the definition of 'felony drug offense' in §802(44) and 'serious drug felony' in §802(57), which in turn incorporates definitional terminology from 18 U.S.C. §924(e)(2), leads this Court to conclude that the 'looser categorical' approach applies where, as here, the Defendant's offenses are offenses under 802(44).").

The government also asks for "involving" to be read expansively based on its plain meaning; this argument is addressed *infra* Section I.B.3.

## 2. Application of the modified categorical approach

Again, because §780-113(a)(30) is divisible by "the particular type of drug," *Henderson*, 841 F.3d 623, 629 (3d Cir. 2016), we must first determine which type of drug formed the bases of Defendants' convictions. The charging documents in Defendants' Pennsylvania criminal cases indicate that they were both convicted of possession with intent to deliver heroin. (Doc. 348-2; Doc. 391).

Here is where the parties diverge: does a §780-113(a)(30) heroin offense involve manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance as defined by the CSA?

A "controlled substance," as used in §780-113(a)(30), refers to "a drug, substance, or immediate precursor included in Schedules I through V of" the Controlled Substance, Drug, Device and Cosmetic Act. 35 Pa. Stat. Ann. §780-102(b). Schedule I, subsection (ii), of the Act includes "[a]ny of the following opium derivates, their salts, isomers, and salts of isomers, unless specifically excepted, whenever the existence of such salts, isomers and salts of isomers is possible within the specific chemical designation: … 10. Heroin." 35 Pa. Stat. Ann. §780-104(1)(ii). The federal CSA, using essentially

the same language, also includes heroin and its salts, isomers, and salts of isomers in Schedule I. 21 U.S.C. §812(a)(b)(10). But, as used in federal Schedule I(b) (which includes heroin), "the term 'isomer' means the optical isomer." 21 U.S.C. §802(14). The Pennsylvania Act does not define "isomer." *See* Pa. Stat. Ann. §780-102. Therefore, Defendants argue, the Pennsylvania statute is broader, because it covers all isomers of heroin, and thus cannot serve as a predicate offense under 21 U.S.C. §841(b)(1)(A).

Indeed, courts in this circuit have observed that Pennsylvania controls a wider range of heroin isomers than the federal schedules cover. *See United States v. Epsy*, No. 2:18-CR-00332, 2022 WL 247833, at *3 (W.D. Pa. Jan. 27, 2022) ("The federal definition of heroin includes heroin and its optical isomers only. Pennsylvania's definition of heroin, however, includes heroin and its salts, isomers, and salts of isomers; which necessarily includes non-optical isomers not covered under federal law. Therefore, on its face, the Pennsylvania definition of heroin covers a wider range of conduct than the federal definition."); *United States v. Ward*, No. 18-148, 2021 WL 5604997, at *1 (W.D. Pa. Nov. 30, 2021) ("Because the plain language of Pennsylvania's definition covers a larger swath of conduct than its federal counterpart, i.e., all isomers of heroin as opposed to only its optical isomer, Ward's statute of conviction is categorically broader than the federal

definition."); *United States v. Myrick*, No. 19-354, 2023 WL 2351693 (E.D. Pa. Mar. 2, 2023) ("[I]t is clear on the face of these statutes that Pennsylvania's is broader; someone could be charged with possessing a non-optical isomer of heroin under Pennsylvania law but not under federal law.").

The government contends that "[h]eroin is not 'defined' more broadly in Pennsylvania." (Doc. 394 at 8–10). It reads Pennsylvania's Schedule I not as *defining* heroin at all, but instead as *listing* heroin, heroin salts, heroin isomers, and salts of heroin isomers as separate controlled substances. Under this construction, it asserts, the modified categorical approach would yield a straightforward comparison—heroin to heroin—with no call to study isomers. To illustrate its reasoning, the government contrasts this case to *United States v. Brown*, 47 F.4th 147 (3d Cir. 2022), which involved prior §780-113(a)(30) marijuana convictions. "Marihuana" is also a Schedule I controlled substance, §780-104(1)(iv); but unlike heroin, it has its own definition in the Pennsylvania Act's "Definitions" provision. §780-102(b). Because "hemp" was removed from the federal definition of marijuana in 2018, but not from the Pennsylvania's definition, *Brown* observed "[t]he

potential for a categorical mismatch."[5] So if Defendants' convictions involved marijuana, the government says, their argument "could have had some force." (Doc. 394 at 9). But "heroin," it argues, has no definition in Pennsylvania; it just means heroin.[6] And heroin is a controlled substance under federal law, too. (Id.).

The government also offers *United States v. Henderson*, 841 F.3d 623 (2016). The defendant there, who was also subject to a mandatory minimum sentence because of previous §780-113(a)(30) heroin convictions,[7] argued that §780-113(f)(1) (which establishes a fifteen year maximum sentence for a person who violates §780-113(a)(30) with respect to a Schedule I or II substance which is also a narcotic drug) was indivisible, because (as the

---

[5] For the defendant in *Brown*, however, this potential mismatch was unavailing because he had committed his offense before the federal drug schedule was amended. *See* 47 F.4th at 155.

[6] It appears that *Epsy*, *Ward*, and *Myrick* did not meet the argument advanced here, and assumed that the relevant comparison grouped heroin and its isomers as a single "element." It should also be noted that *Epsy* and *Ward* (which both involved USSG §4B1.2(b)) rejected this "categorical mismatch" theory on other grounds. And any conclusion therein that §780-113(a)(30) is broader than the USSG §4B1.2(b) definition has been abrogated by *Lewis*, 58 F.4th at 769 (see *supra* note 1). Only *Myrick* concluded that a §780-113(a)(30) heroin offense is not a "serious drug offense" under 18 U.S.C. §924(e)(2)(A)(ii). 2023 WL 2351693, at *7.

[7] The *Henderson* defendant was convicted for unlawful possession of a firearm by a convicted felon under 18 U.S.C. §922(g)(1). 841 F.3d at 625. A person who violates §922(g) after three or more serious drug offenses (as defined by §924(e)(2)(A)(ii)) shall be imprisoned not less than fifteen years. §924(e)(1).

court put his argument) "it addresses only different *means* of committing the offense, rather than different *elements*." 841 F.3d at 625, 627–28. The Third Circuit disagreed, concluding that "[t]hose particular controlled substances" classified as controlled substances under Schedules I and II are "distinct elements of the crime; not means of committing the crime." 841 F.3d at 629. The defendant also argued that the district court had improperly relied on documents other than his "actual conviction document" to determine that his Pennsylvania convictions involved heroin. *Id.* at 631–32. The Third Circuit again disagreed, because the district court had relied on a "reliable judicial record" along with "other mutually corroborating records." *Id.* at 632. It thus concluded that "the District Court properly determined that Henderson's conviction … involved heroin, which is a controlled substance under 21 U.S.C. §802, and was a predicate offense for the imposition of [the Armed Career Criminal Act's] fifteen-year minimum sentence." *Id.*

Importantly, the defendant in *Henderson* did not argue that his §780-113(a)(30) convictions could not serve as predicate "serious drug offenses" because Pennsylvania controls heroin isomers that federal law does not. So *Henderson* did not address this theory, and it cannot be read as implicitly endorsing the government's view. *See Myrick*, 2023 WL 2351693, at *4 n.2.

- 17 -

### a. Are heroin and isomers of heroin separate elements of §780-113(a)(30)?

The government's theory would treat heroin and isomers of heroin as two alternative elements of a §780-113(a)(30). Although its argument is not specifically described this way, this is its necessary operation. That is because the modified categorical approach distinguishes only elements of the state offense, so if heroin and isomers of heroin are not separate elements, there is no occasion to distinguish them for comparison to the federal criteria. The government instead frames its argument as an exercise in "[e]lementary statutory analysis." (Doc. 394 at 8 ("The schedules do not *define* any substances—they *list* them")).

### i.    Statutory Analysis

Initially, the fact that an item is "listed" does not itself make that item an element; it merely triggers the "elements or means" inquiry. *Mathis*, 579 U.S. at 517 ("The first task for a sentencing court faced with an alternatively phrased statute is thus to determine whether its *listed* items are elements or means." (emphasis added)). The particular controlled substances enumerated in §780-104 are elements not merely because they are listed, but because the identity of the substance in question as one of these enumerated substances is a fact that "the prosecution must prove" and a trial

judge is "actually required to find" to convict. *United States v. Tucker*, 703 F.3d 205, 215 (3d Cir. 2012). *Abbot*, *Tucker*, and *Henderson*, which all concluded that the particular listed controlled substance is an element of §780-113(a)(30), cannot be said to have implicitly concluded that listed isomers, too, are separate elements, for those cases presented no need to distinguish between the substance at issue and its isomers. *See United States v. Abbott*, 748 F.3d 154, 159 (3d Cir. 2014) (prior conviction involving cocaine); *Tucker*, 703 F.3d at 215–16 (cocaine); *Henderson*, 841 F.3d at 629 (heroin). The argument raised here requires that the court go a step further, and decide whether isomers of heroin are an element separate from heroin itself.

With respect to the government's "elementary statutory analysis" argument, the court is not convinced that the formulation used in Schedule I(ii) demonstrates an intent by the General Assembly to treat heroin and isomers of heroin as separate elements. For one thing, the only courts to address this comparison (as far as we are aware), have regarded isomers of heroin as part of the "definition," and therefore one and the same element as, heroin, albeit without meeting the argument raised here. *See Epsy*, 2022 WL 247833, at *3; *Ward*, 2021 WL 5604997, at *1; *Myrick*, 2023 WL 2351693, at *4. For another, §780-104(1)(ii) restricts the inclusion of "their

salts, isomers, and salts of isomers" to "whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation." Thus, the statute by its terms groups heroin and heroin isomers "within" one "chemical designation." Presumably, the term "chemical designation" differentiates one substance from another, and so the fact that isomers of heroin are "within" heroin's chemical designation suggests that they are likewise "within" the statute's *definition* of heroin.

The government also suggests that if the General Assembly had intended to "define" heroin to include its isomers (rather than "list" it along with its isomers), it would have done so by adding a "heroin" definition in §780-102, like it did for "marihuana." But that approach would have needlessly clogged §780-102, for it would have required adding identical definitions also for the other 21 substances listed in Schedule I(ii). The more efficient route would have been to include that definition directly in §780-104(1)(ii) to govern the entire list. Moreover, a separate definition of "marihuana" was necessary because that term appears in multiple sections of the Controlled Substance, Drug, Device and Cosmetic Act, *see, e.g.*, §780-113(a)(31), whereas "heroin" appears only in §780-104.

### ii.    Elements vs. means

The modified categorical approach "serves—and serves solely—as a tool to identify the elements of the crime of conviction when a statute's disjunctive phrasing renders one (or more) of them unique." *Mathis*, 579 U.S. at 513. So when "faced with an alternatively phrased statute," courts must decide first "whether its listed items are elements or means," i.e., whether it is divisible. *Id.* at 517.

What are elements? They are "the constituent parts of a crime's legal definition—the things the prosecution must prove to sustain a conviction." *Id.* at 504. "At trial, they are what the jury must find beyond a reasonable doubt to convict the defendant; and at a plea hearing, they are what the defendant necessarily admits when he pleads guilty." *Id.* (internal citations omitted). "Facts, by contrast … need neither be found by a jury nor admitted by a defendant." *Id*. The elements or means question might be resolved by the statute "on its face"—"[i]f statutory alternatives carry different punishments, under *Apprendi* [*v. New Jersey*, 530 U.S. 466, 490 (2000)][8] they must be elements"; a statute also "may identify which things must be charged and

---

[8] *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490 (2000).

(and so are elements) and which need not be (and so are means)." *Mathis*, 579 U.S. at 518. "Conversely, if a statutory list is drafted to offer 'illustrative examples,' then it includes only a crime's means of commission." *Id.*

Because *Mathis* also instructed that when a state-court ruling answers the elements-or-means question, "a sentencing judge need only follow what it says," 579 U.S. at 517–18, *Henderson* observed that the Pennsylvania Superior Court had "found that the specific type of drug used was an element of the offense; not a means of committing the offense." 841 F.3d at 629 (citing *Commonwealth v. Swavely*, 554 A.2d 946, 949 (Pa. Super. Ct. 1989), *petition for allowance of appeal denied*, 571 A.2d 382 (Pa. 1989)). The Third Circuit reasoned that "[t]he same logic applies with respect to Section 780-113(f)(1) … [i]n order to find Henderson guilty of possession of heroin, a jury would have to conclude that Henderson, in fact, possessed the specific drug which has been classified as a controlled substance in Schedule I or II by the Pennsylvania General Assembly." *Id.*; *see also United States v. Tucker*, 703 F.3d 205, 215 (3d Cir. 2012) ("Because [the defendant] was specifically charged with [possession with intent to distribute] cocaine, the trial judge was 'actually required' to find that Tucker possessed cocaine in order to convict. Possession (or manufacture, or delivery) of a 'controlled substance' is an element of the offense; to prove it, the prosecution must prove that the

substance in question was one of those enumerated in Pennsylvania's controlled substance schedules.").

The government's construction of §780-104(1)(ii) conceives of a system in which, to prove that a defendant violated §780-113(a)(30) by possessing with intent to distribute heroin, the Commonwealth would have to prove (and the jury or trial judge would have to find) that the substance involved was heroin specifically, *and not* an isomer of heroin. And in this system, possession of heroin and an isomer of heroin could be two separate offenses. If the Commonwealth were not required to prove specifically that the substance was heroin, as opposed to merely an isomer of heroin, these would not be separate elements; the Commonwealth would satisfy its burden simply by proving that the substance was either heroin *or* an isomer of heroin (or a salt or salt of isomer). That is, possessing with intent to distribute heroin and PWID an isomer of heroin would just be two different *means* of committing the same offense, not two alternative elements of §780-113(a)(30).

Following *Mathis*'s instructions then, the court first finds that the statute on its face does not resolve the elements or means question. It does not impose different punishments for convictions involving heroin than for those involving isomers of heroin, and it does not specify whether either needs to

- 23 -

be charged. Nor does it designate isomers as only an illustrative example of a heroin crime.

As to state-law decisions, the case relied on by *Henderson*, *Commonwealth v. Swavely*, 554 A.2d 946, 947 (Pa. Super. Ct. 1989), involved conviction for and "the imposition of separate consecutive sentences for delivery of two different prohibited narcotics in a single sale." The defendant there argued that he had received separate sentences for "a single offense" in violation of the Constitution's Double Jeopardy Clause and Pennsylvania's merger doctrine, which "acts to limit the multiplicity of sentences … for those crimes which, in effect, constitute a single crime." *Id.* at 948, 951.

The Superior Court reasoned:

[A]ppellant was charged in separate counts with two violations of 35 Pa. Stat. Ann. §780-113(a)(30), delivery of a controlled substance …. [I]n order to find appellant guilty on count five, delivery of a Schedule II controlled substance, Tuinal, the jury had to conclude that there was a transfer of Tuinal from appellant to another person. However, in order to find appellant guilty of count six, delivery of a Schedule IV controlled substance, Talwin, the jury had to conclude that there was a transfer of Talwin from appellant to another person …. Each offense includes an element distinctive of the other, *i.e.*, the particular controlled substance. Therefore, we conclude that when the vial containing the two separate drugs was delivered, two separate offenses occurred.

554 A.2 at 949.

*Swavely* dealt with two substances listed on different schedules, so it does not answer the question whether an enumerated substance and isomers of that substance are separate elements.

There appears to be no state-court decision directly answering this question, but *Commonwealth v. Slyman*, 483 A.2d 519, 523–25 (Pa. Super. Ct. 1984) does provide some guidance. There, the appellant (the defendant in the criminal trial) was convicted of several counts of possession with intent to deliver and delivery of cocaine under §780-113(a)(30). *Id.* at 522. He argued that only those forms of cocaine which are naturally derived from cocaine leaves were controlled substances,[9] and that the Commonwealth at trial had not proven beyond a reasonable doubt that the substance which he possessed and sold was L-cocaine, the only one among cocaine's eight

---

[9] Then, as now, Schedule II(i) of the Controlled Substance, Drug, Device and Cosmetic Act included, "whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by combination of extraction and chemical synthesis:

> 4. Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative or preparation thereof which is chemically equivalent or identical with any of these substances, but shall not include decocainized coca leaves or extracts of coca leaves, which extracts do not contain cocaine or ecgonine.

35 Pa. Stat. Ann. §780-104(2)(i); 483 A.2d 519, 523 & n.7, 524.

isomers that is "produced directly through extraction from coca leaves." *Id.* at 524. The Commonwealth's expert witnesses (two forensic chemists) had been able to confirm the presence of "only two of the eight isomeric forms of cocaine known to exist": "the synthetic D-cocaine and the organic L-cocaine." *Id.* at 524.

The Superior Court first concluded that, contrary to the appellant's contention, the Act "intended to prohibit all varieties of cocaine including that derived directly from coca leaves as well as that synthetically produced in the laboratory, such as D-cocaine." *Id.* at 525. It then reasoned that:

> Insofar as both parties to the instant appeal agree that the Commonwealth's laboratory experts conclusively identified the white powder seized from appellant as being either the naturally-occurring L-cocaine or the synthetic D-cocaine, and in view of our holding that the Act proscribes cocaine in both its natural and synthetic forms, the Commonwealth's evidence was more than sufficient to uphold appellant's conviction of the numerous cocaine offenses.

483 A.2d at 525.

Because the Act does not specifically reference "isomers" of cocaine, like it does for heroin, and because Schedule II(i)'s introduction uses different language than that of Schedule I(i), the court cannot say that *Slyman* definitively answers the question presented here. But we may glean from *Slyman* the more general principle that, where the Act controls *all* isomeric forms of a particular substance, the Commonwealth need not prove that the

substance possessed was a particular one of those isomers to sustain a conviction.

*Mathis* provides that, in addition to the statute on its face and state-court decisions, "federal judges have another place to look: the record of the prior conviction itself." 579 U.S. at 518. That is, we may "peek at the record documents for the sole and limited purpose of determining whether the listed items are elements of the offense." *Id.* Here, the charging documents simply designate the offenses as "possession of a schedule I controlled substance, to wit: Heroin" or "did possess with intent to deliver a quantity of Heroin, a Schedule I Controlled Substance." (Doc. 348-1; Doc. 348-4; Doc. 348-6; Doc. 391 at 4). These records are not conclusive, because that is the phrasing we would expect if heroin and isomers of heroin are considered a single element. *See Mathis*, 579 U.S. at 519 (explaining that the use of a "single umbrella term" to encompass the possible means of commission would be indicative). While the documents here do not specifically include isomers of heroin within the term "heroin," neither do they use the term "heroin" "to the exclusion of" isomers of heroin, which would signal that these were separate elements. *See id.*

### iii.   Conclusion

Having exhausted the methods outlined by *Mathis* and finding no clear answer, the court is left to infer the General Assembly's intent. As discussed *supra*, the court does not consider Schedule I(ii)'s formulation conclusive. Considering *Slyman*, from which the principle may be drawn that the Commonwealth generally need not distinguish between controlled substance isomers to sustain a controlled substance conviction, together with the fact that Pennsylvania controls *all* isomers of heroin, the court finds an inference that the General Assembly nonetheless intended to treat heroin and isomers of heroin as separate elements unwarranted. The fact that isomers of heroin are within the same "chemical designation" as heroin, *see* §780-104(1)(ii) ("whenever the existence of such … isomers … is possible within the specific chemical designation."),[10] unlike the separately enumerated controlled substances, which have different chemical designations, buttresses this conclusion.

Therefore, the court concludes that isomers of heroin are not an element of §780-113(a)(30) alternative to heroin itself. So the modified categorical approach directs us to compare heroin (including its isomers) as

---

[10] The court notes that "[i]somers are chemical compounds that have the same composition but differ in the chemical arrangement of their constituents." *United States v. Minter*, 80 F.4th 406, 410 (2d Cir. 2023).

defined under Pennsylvania law to heroin (including its isomers) as defined under federal law.

### b. Must Defendants show that there is a "realistic probability" of conviction for possession of a non-optical isomer of heroin?

The government also asserts that, even if §780-104(1)(ii) is construed as *defining* heroin more broadly than the federal CSA, a §780-113(a)(30) heroin offense still qualifies as a "serious drug felony" under 18 U.S.C. §924(e)(2)(A)(ii) because there is no "realistic probability" or "factual possibility" that Pennsylvania would prosecute possession of non-optical isomers of heroin. (Doc. 394 at 10).

### i. Realistic probability

Although the Supreme Court has applied a "realistic probability" test before concluding that a state statute punishes conduct outside a generic crime's definition, *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007); *Moncrieffe v. Holder*, 569 U.S. 184, 191 (2013), the Third Circuit has recognized that those cases involved comparison of statutes with identical elements. *Singh v. Attorney Gen.*, 839 F. 3d 273, 286 n.10 (3d Cir. 2016). Where "the elements of the crime of conviction are not the same as the elements of the generic federal offense," by contrast, "the 'realistic

probability' language is simply not meant to apply." *Id.*; *Salmoran v. Attorney Gen.*, 909 F.3d 73, 81 (3d Cir. 2018).

The statutes here do not have identical elements. Pennsylvania's heroin element includes all isomers of heroin, while the federal definition of "controlled substance" does not. So the "realistic probability" doctrine does not apply. *See Myrick*, 2023 WL 2351693, at **5–6; *United States v. Baskerville*, No. 1:19-CR-0033, 2022 WL 4536126, at *4 (M.D. Pa. Sept. 28, 2022). The government acknowledges *Salmoran* but attempts to distinguish it based on the theories that (1) §780-113(a)(30) does not "plainly encompass[] more conduct than its federal counterpart," *Salmoran*, 909 F.3d at 82, because the Pennsylvania Act does not define "isomer" and (2) there is no incongruity because heroin and isomers of heroin are separate elements. (Doc. 394 at 11 n.6). That Pennsylvania law does not specifically define "isomer" does not make any mismatch here less plain; its Schedule I(ii) facially includes "isomers" of heroin, *without* limitation to only optical isomers. And, as explained *supra* Section I.2.a, the court disagrees with the theory that heroin and isomers of heroin are separate elements. So it is unconvinced by the government's suggestion that *Salmoran* does not control.

- 30 -

The government also points to *Ward*, 2021 WL 5604997, at *2, which did apply the "realistic probability" rule to this comparison. *Ward* distinguished *Salmoran* on the basis that "non optical isomers of heroin" are not themselves an element of a §780-113(a)(30) offense; because they "neither increase the possible range of penalties[] nor need to be proven by the prosecution," *Ward* reasoned, non-optical isomers of heroin "simply are means of committing the same crime—*i.e.*, possession with intent to distribute heroin." *Id.* The court disagrees with this logic (as did *Myrick*, *see* 2023 WL 2351693, at **5–6). *Ward* appears to have assumed that *Salmoran* would apply only if non-optical isomers were an element, thus giving the state statute an element not present in the federal one. But there is no need to find an extra element, for the statutes' heroin elements are not identical. Because Pennsylvania's heroin element includes all isomers, and federal law includes only optical isomers, we are not dealing with identical elements, and *Salmoran* is apposite. *See Myrick*, 2023 WL 2351693, at **5–6. So it matters not whether there is a realistic probability that non-optical isomers would form the basis of a conviction, for Pennsylvania law facially allows such a prosecution. *See Salmoran*, 909 F.3d at 82 ("[B]ecause [the New Jersey statute of conviction] plainly encompasses more conduct than its federal

counterpart, Salmoran does not need to identify cases in which New Jersey actually prosecuted overbroad conduct.").

### ii. Factual possibility

As to the "factual possibility" argument—the government's assertion of impossibility should be distinguished from certain dispositive impossibilities that have been recognized in similar contexts. The government says that Defendants could not have been convicted of possession with intent to distribute a non-optical isomer of heroin because, according to the testimony (given in another case) of a forensic specialist, Pennsylvania State Police crime laboratories do not consider non-optical isomers of heroin to be heroin. (Doc. 394 at 12; Doc. 394-1). Some courts have declined to find a categorical mismatch where the forms controlled by state but not federal law, "as a matter of chemistry, do not exist and cannot possibly exist." *United States v. Turner*, 47 F.4th 509, 514, 524 (7th Cir. 2022); *United States v. Rodriguez-Gamboa*, 972 F.3d 1148, 1155 (9th Cir. 2020).

There has been no evidence presented that non-optical isomers of heroin do not exist as a matter of chemistry. That PSP crime laboratories do not consider them heroin does not make conviction factually impossible, for their policies are not law. And in Pennsylvania, chemical analysis is not

required to establish a narcotic substance's identity. *Commonwealth v. Minott*, 577 A.2d 928, 932 (Pa. Super. Ct. 1990).

### c. Does *Shular* eliminate any categorical mismatch here?

Finally, the government maintains that *Shular* compels denial of Defendants' motion. It takes issue with *Myrick* for not "cit[ing] nor follow[ing] the *Shular* conduct-based categorical approach." (Doc. 394 at 13).

Again, *Shular* explained that, while the categorical approach normally requires comparison to a "generic" crime, some statutes refer to certain criteria rather than to a specific offense. 589 U.S. at 158. So for a court faced with such a statute, "no identification of generic offense elements [is] necessary," the court simply asks whether the prior conviction meets those criteria. *Id.* at 158–59.

Although *Myrick* did not cite *Shular*, the court does not see how it strayed from this approach. It did not define any "generic" drug crime for comparison. Rather, it compared the offense of conviction (a §780-113(a)(30) heroin violation) with 18 U.S.C. §924(e)(2)(A)'s requirement that the offense involve "a controlled substance" as defined by the CSA. Because "Pennsylvania's definition of heroin is … broader" than the CSA's, and a §780-113(a)(30) heroin offense therefore does not necessarily involve a

"controlled substance" as defined by the CSA (for "someone could be charged with possessing a non-optical isomer of heroin under Pennsylvania law but not under federal law"), *Myrick* concluded that the defendant's §780-113(a)(30) heroin conviction could not be a predicate "serious drug felony" under 18 U.S.C. §924(e)(2)(A)(ii). 2023 WL 2351693, at **4, 7.

The government further contends that §924(e)(2)(A)(ii)'s use of the term "involving" should be interpreted expansively to include all varieties of a §780-113(a)(30) heroin offense. (Doc. 394 at 13–14). It characterizes *Shular*'s use of the term "necessarily entails" as dicta, and invites the court to instead employ the "plain meaning of 'involve'"—"'to relate closely' or to 'connect closely.'" (Doc. 394 at 14 (quoting *United States v. Gibbs*, 656 F.3d 180, 184 (3d Cir. 2011)).

*Gibbs* construed "involve" with respect to the *conduct* that §924(e)(2)(A)(ii) encompasses: "manufacturing, distributing, or possessing." 656 F.3d at 184 ("The definition of a serious drug offense should be construed to extend §924(e) beyond the precise offenses of distributing, manufacturing, or possessing, and as encompassing as well offenses that are related to or connected *with such conduct*." (emphasis added)),[11] *not*

---

[11] Hence, a state-law conviction for wearing body armor while committing a felony, where that felony is possession with intent to distribute

*(footnote continued on next page)*

with respect to the substance used. And the court declines to read §924(e)(2)(A)(ii), which specifically limits "controlled substance" to those substances defined by the CSA, to also include substances *related to* those substances. Such an interpretation would be at odds with the statute's apparent purpose to confine "controlled substance" to the federal schedules. Thus, while the statute may encompass more *conduct* than the specific activities of manufacturing, distributing or possessing (that is, conduct of which manufacturing, distributing or possessing a controlled substance is "an inherent part or result," *Gibbs*, 656 F.3d at 188), it plainly encompasses only those *substances* which are "defined in section 102 of the Controlled Substances Act." 18 U.S.C. §924(e)(2)(A)(ii).

The government nevertheless insists, perhaps as a reprise of its factual impossibility argument, that conviction for possession with intent to distribute heroin in Pennsylvania *does* necessarily entail possession of a CSA controlled substance. (Doc. 394 at 14). But it does not. The Pennsylvania conviction *could* (at least by the letter of the law) entail

---

cocaine, was an offense "involving" possession with intent to distribute a federally controlled substance. *Gibbs*, 656 F.3d at 188. That was because possession with intent to distribute a federally controlled substance is "an inherent part or result" of that state-law offense. *Id.* By contrast, an offense of conviction which could result from possession of a substance *not* controlled by the federal CSA would not have as "an inherent part or result" possession of a federally controlled substance.

possession with intent to distribute a non-optical isomer of heroin, which is excluded from the CSA schedules.

### 3. Conclusion

Having established the appropriate comparators, the court can compare the crime of conviction to the federal criteria. Defendants were convicted under 35 Pa. Stat. Ann. §780-113(a)(30) for possessing heroin. That offense, because it could involve isomers of heroin other than the optical isomer, does not categorically meet 18 U.S.C. §924(e)(2)(A)(ii)'s criterion that the offense involve a "controlled substance" as defined by Controlled Substances Act, which only includes optical isomers of heroin. Therefore, the court concludes that Defendants' Pennsylvania convictions cannot subject them to 21 U.S.C. §841(b)(1)(A)'s 25-year mandatory minimum sentence.

The court recognizes that, as applied here as well as in many other cases, the categorical approach yields a "counterintuitive" result. *United States v. Mayo*, 901 F.3d 218, 230 (3d Cir. 2018); *United States v. Ramos*, 892 F.3d 599, 606 (3d Cir. 2018); *see also Mathis* 579 U.S. at 521 (Kennedy, J., concurring) (observing the "arbitrary and inequitable results produced by applying an elements based approach" to federal sentencing). Though there is no suggestion by Defendants that their prior convictions *were* for

possession with intent to distribute non-optical isomers of heroin, they are effectively treated that way. But despite the government's forceful arguments to the contrary, that is what the categorical approach requires. *See Ramos*, 892 F.3d at 606 ("[T]he categorical approach requires courts not only to ignore the actual manner in which the defendant committed the prior offense, but also to presume that the defendant did so by engaging in the 'minimum conduct criminalized by the state statute.'" (quoting *Moncrieffe*, 569 U.S. at 191)). Like it or not the court is bound to employ that approach, as directed by the United States Supreme Court, even if it is truly disturbing how this ethereal, academic approach warps and distorts the practical, real world we live in and the application of common sense criminal statutes.

Accordingly, Defendants' motion to dismiss the informations of prior convictions will be granted. This decision should not be read as opining on the applicability of the United States Sentencing Guidelines to Defendants' Pennsylvania convictions.

## II.   MOTION TO COMPEL THE GOVERNMENT TO IDENTIFY EXCULPATORY EVIDENCE AND THE DOCUMENTS THEY INTEND TO USE IN THE GOVERNMENT'S CASE IN CHIEF

Next, Defendants Bell and Jones request that the court order the government "to identify any documents or discovery materials it plans to offer in its case-in-chief and any Brady materials or documents potentially relevant to [their] defense." (Doc. 346 at 5). They aver that the government has produced "voluminous discovery materials" but "has highlighted no relevant documents or provided a set of 'hot' documents important to its case or potentially relevant to [Defendant's] defense." (Doc. 347 at 18). They further aver that "[k]eyword and content searches cannot be performed on most of the discovery materials, including without limitation approximately 60,000 pages of Facebook records," and that although the Cellebrite® extraction reports produced may be searched, "it is difficult to open, view, navigate, and search these reports." (Id.).

Following the holding in *Brady v. Maryland*, 373 U.S. 83, 87 (1963) that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment," it has been recognized that prosecutors have an affirmative constitutional obligation to disclose such evidence to criminal

defendants. *Strickler v. Greene,* 527 U.S. 263, 280–81 (1999). The purpose of the *Brady* rule is "not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675 (1985). Accordingly, "*Brady* and its progeny permit the government to make information within its control available for inspection by the defense, and impose no additional duty on the prosecution team members to ferret out any potentially defense-favorable information from materials that are so disclosed." *United States v. Pelullo*, 399 F.3d 197, 212 (3d Cir. 2005).

Defendants here do not contend that the government has failed to disclose exculpatory evidence. They simply seek to require it to identify such evidence among the larger set of materials it has produced. *Brady* imposes no such obligation. *See Pelullo*, 399 F.3d at 212–13.

Some courts outside this circuit have held that the government's *Brady* obligation is not satisfied by this type of "open file" disclosure approach. *See United States v. Blankenship*, No. 5:14-cr-00244, 2015 WL 3687864, at *3 (S.D. W. Va. June 12, 2015) ("[W]ithout more, the United States does not comply with the requirement of *Brady* by merely including all known *Brady* material within the four million plus pages of discovery."); *United States v. Hsia*, 24 F. Supp. 2d 14, 28–29 (D. D.C. 1998) ("The government cannot

meet its *Brady* obligations by providing Ms. Hsia with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack."); *United States v. Sayler*, Cr. No. S-10-0061, 2010 WL 3036444, at **3–7 (E.D. Cal. Aug. 2, 2010). By contrast, where the government has provided voluminous discovery but in searchable, indexed form, and identified "hot documents," the open file approach has been deemed not violative of *Brady*. *See United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *vacated on other grounds*, 561 U.S. 358 (2010); *United States v. Ferguson*, 478 F. Supp. 2d 220, 242 (D. Conn. 2007).

But again, our circuit has upheld this approach, without regard to whether the materials were searchable, indexed, or whether hot documents were identified. *See Pelullo*, 39 F.3d at 212–13. Additionally, at the February 23, 2024 scheduling conference, the court directed defense counsel in this case to meet with the government and the government to identify during such meetings, inasmuch as it is aware of, any hot documents applying to specific defendants. The government represents that it did meet with Defendant Bell's counsel, and that the parties agreed such meeting was helpful. They are commended for their cooperation.

But the court did not, and does not now, order the government to affirmatively search through the material disclosed and highlight all *Brady*

material. This decision assumes that the discovery produced actually does contain all *Brady* material, because "if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the [government] is constitutionally obligated to disclose under *Brady*." *Strickler v. Greene*, 527 U.S. 263, 273 n.23 (1999).

Defendants' motion to compel will therefore be denied.

### III.   MOTION   FOR   DISCOVERY   OF   CO-CONSPIRATOR   STATEMENTS

Defendants Bell and Jones next move the court to direct the government to disclose any co-conspirator statements it intends to offer against them. (Doc. 346 ¶¶16–17).

A statement that "is offered against an opposing party and … was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R. Evid. 801(d)(2)(E). So the rule against hearsay would not bar the government from introducing at trial statements of Defendants' co-conspirators made during and in furtherance of the conspiracy.

The Federal Rules of Criminal Procedure do not authorize "the discovery or inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. §3500." Fed. R. Crim. P. 16(a)(2). Section 3500, known as the Jencks Act, provides that:

> In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

18 U.S.C. §3500(a).

Relevant oral statements "made by the defendant," on the other hand, "before or after arrest, in response to interrogation by a person the defendant knew was a government agent[,] if the government intends to use the statement at trial," must be disclosed upon the defendant's request. Fed. R. Civ. P. 16(a)(1)(A).

Some courts have reasoned that, in light of Rule 801(d)(2)(E), co-conspirators' statements may be considered statements "made by the defendant" and therefore discoverable under Rule 16(a)(1)(A) if the co-conspirator is not a prospective government witness. *See United States v. Madeoy*, 652 F. Supp. 371, 375 (D. D.C. 1987); *United States v. Williams*, 113 F.R.D. 177, 180 (M.D. Fla. 1986); *United States v. Konefal*, 566 F. Supp.

698, 705–06 (N.D. N.Y. 1983); *United States v. Agnello*, 367 F. Supp. 444, 448 (E.D. N.Y. 1973).

Courts have also ordered such disclosure without concluding that Rule 16(a)(1) requires it, but instead after observing that the Jencks Act only prohibits pre-trial disclosure of prospective witnesses and finding disclosure of non-witness coconspirator statements appropriate. *See United States v. Bloom*, 78 F.R.D. 591, 618 (E.D. Pa. 1977).

But other courts, including several Courts of Appeals as well as district courts in our circuit, have declined to order such discovery, concluding that Rule 16 does not require it. *United States v. Tarantino*, 846 F.2d 1384, 1418 (D.C. Cir. 1988) ("[W]e think it clear that as used in Fed. R. Crim. P. 16(a)(1)(A) the phrase 'statements by the defendant' does not include statements by co-conspirators of the defendant, even if those statements can be attributed to the defendant for purposes of the rule against hearsay."); *United States v. Roberts*, 811 F.2d 257, 258 (4th Cir. 1987); *United States v. Mayberry*, 896 F.2d 1117, 1122 (8th Cir. 1990); *United States v. Orr*, 825 F.2d 1537, 1541 (11th Cir. 1987); *United States v. Coles*, 511 F. Supp. 3d 566, 579–80 (M.D. Pa. 2021); *United States v. Johnson*, 218 F. Supp. 3d 454, 458 (W.D. Pa. 2016); *United States v. Cheatham*, 500 F. Supp. 2d 528,

538–39 (W.D. Pa. 2007); *United States v. Giampa*, 904 F. Supp. 235, 285 (D. N.J. 1995), *affirmed without opinion*, 107 F.3d 9 (3d Cir. 1997).

The court agrees with this weight of authority and will deny Defendants' motion for discovery of coconspirators' statements.

## IV.  MOTION FOR SEPARATE HEARING TO DETERMINE EXISTENCE OF CONSPIRACY

Anticipating that the government will seek to introduce at trial statements of other alleged conspirators as non-hearsay, Defendants Bell and Jones move for a pretrial hearing to determine whether a conspiracy existed. (Doc. 346 ¶18–22).

As discussed above, a statement that "is offered against an opposing party and … was made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay. Fed. R. Civ. P. 801(d)(2)(E). The party offering such statements must prove the existence of a conspiracy by a preponderance of the evidence. *Bourjaily v. United States*, 483 U.S. 171, 176 (1987).

"Control of the order of proof at trial is a matter committed to the discretion of the trial judge." *United States v. Continental Group*, 603 F.2d 444, 456 (3d Cir. 1979). The Third Circuit has held that a trial court may

"admit co-conspirators' declarations under Rule 801(d)(2)(E) subject to later connection" to proof of a conspiracy. *In re Fine Paper Antitrust Litigation*, 685 F.2d 810, 821 (3d Cir. 1982), but has also recognized that the danger of prejudicing the jury if the later connection is not established requires that this approach "be carefully considered and sparingly utilized by the district courts." *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991) (citing *Continental Group*, 603 F.2d at 457). Where, for example, a case involves a "large amount of interrelated testimony to be considered" such that a different order may be "unduly complex and confusing," the "subject to later connection" approach is appropriate. *United States v. Gambino*, 926 F.2d at 1360.

Alternatively, proof of conspiracy could be offered before coconspirators' statements are admitted, eliminating the risk of mistrial on this ground. This approach has been recommended "whenever reasonably practicable." *United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979); *see also United States v. Cox*, 923 F.2d 519, 526 (7th Cir. 1991) ("[A] preferable procedure would be to at least require the government to preview the evidence which it believes brings the statements within the co-conspirator rule before delving into that evidence at trial.").

In cases like this, where the alleged conspiracy involves a sizable group, a pre-trial hearing risks becoming a "mini-trial." *United States v. Cheatham*, 500 F. Supp. 2d 528, 537 (W.D. Pa. 2007). The conspiracy charge here is common to 15 Defendants. The existence of a conspiracy will thus be a central issue at trial, and so "judicial economy would seem to favor the absence of duplication of the parties' efforts before the [c]ourt." *Id.*

Given the complexity of the conspiracy alleged here, the court will not order a pretrial hearing. To the extent the government seeks to admit coconspirators' statements pursuant to Rule 801(d)(2)(E), the court will permit it to do so subject to later connection to the foundational factual requirements of 801(d)(2)(E). *See United States v. Savage*, No. 07-550, 2012 WL 5866068, at *4 (E.D. Pa. Nov. 20, 2012) (outlining this procedure and noting that "[t]o the extent that the Government does not meet its burden in establishing a conspiracy, any Defendant may move for a mistrial and/or directed verdict at the conclusion of the government's case").

Defendants' motion for a separate hearing will therefore be denied.

## V.    MOTION TO SUPPRESS

Finally, Defendant Bell alone moves for the suppression of certain packages seized by postal authorities and their contents. (Doc. 346 ¶¶23–

25). He argues that this evidence was obtained by the government in violation of the Fourth Amendment.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although its text does not expressly provide for suppression, it has been recognized that in some circumstances the Fourth Amendment calls for exclusion of evidence obtained in violation of its command. *Utah v. Strieff*, 579 U.S. 232, 236 (2016). This so-called "exclusionary rule encompasses both 'the primary evidence obtained as a direct result of an illegal search or seizure and … evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Id.* (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). Because of the "substantial social costs" associated with suppressing evidence of guilt, the Court has held that the exclusionary rule is applicable only "where its deterrence benefits outweigh its 'substantial social costs.'" *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

The Fourth Amendment's protection against unreasonable searches and seizures by government officials extends to packages mailed via the United States Postal Service. *United States v. Leeuwen*, 397 U.S. 249, 251– 52 (1970). Packages can generally be detained based on reasonable

suspicion and opened only under a warrant. *Id.*; *United States v. Golson*, 743 F.3d 44, 55 (3d Cir. 2014). The reasonable suspicion determination accounts for the "totality of the circumstances," and "allows officers to draw on their experience and specialized training to make inferences from and deductions about cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Although a "mere hunch" is insufficient, "the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* at 274.

Searches conducted pursuant to a warrant are reviewed with deference. *Ornelas v. United States*, 517 U.S. 690, 698–99 (1996); *United States v. Whitner*, 219 F.3d 289, 296 (3d Cir. 2000). "A reviewing court must determine only that the magistrate judge had a 'substantial basis' for concluding that probable cause existed to uphold the warrant." *Whitner*, 219 F.3d at 296; *see also United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993) ("Even if a reviewing court would not have found probable cause in a particular case, it must nevertheless uphold a warrant so long as the issuing magistrate [judge's] determination was made consistent with the minimal substantial basis standard."). This determination is made considering the

magistrate judge's task, which is to "make a practical commonsense decision whether, given all the circumstances set forth in the affidavit before him there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Whitner*, 219 F.3d at 296 (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Here, postal inspectors seized several packages sent from Arizona to Pennsylvania. Some of these packages were searched without a warrant; others were searched pursuant to warrants. These searches revealed pills suspected to contain fentanyl.

Defendant contends both that the postal inspectors lacked reasonable suspicion to seize these packages and that the search warrants issued lacked probable cause. (Doc. 347 at 26–35). Five specific parcels are at issue, each identified by its U.S.P.S. Express mail tracking number.

### 1.  Parcel 1 - Tracking No. EJ 016 803 416 US

The first parcel was sent from Peoria, Arizona and addressed to a residence in Wilkes-Barre. Postal inspectors detained the parcel because the destination was "a know[n] drug trafficking area," the parcel was "taped or glued on all seams," possessed a "narcotics odor," was "mailed from a known drug source area," and the zip code of origin and return address were distant from one another. (Doc. 394-2). In addition, the CLEAR database

indicated that neither the sender nor addressee were associated with the respective addresses. (Id.).

USPS attempted to contact the sender and intended recipient. Because no response was received, the parcel was deemed unclaimed or abandoned and searched pursuant to USPS policy. (Id.).

The facts listed above gave postal inspectors reasonable suspicion to seize this parcel. Postal officers' experience regarding the typical origins and routes of mailed contraband can contribute to a finding of reasonable suspicion for packages of the same pattern. *See Golson*, 743 F.3d at 55 n.10; *United States v. Colon*, 386 Fed. App'x 229, 231 (3d Cir. 2010) (non-precedential). So can the fact that the named addressee is not associated with the listed address. *Id.* (both cases). A different zip code of origin and return address and taping on seams may also indicate the presence of contraband. *Colon*, 386 Fed. App'x at 231.

The seizure here was made based on a combination of several known indicia of criminal activity which more than sufficed to establish reasonable suspicion. Therefore, the seizure was not in violation of the Fourth Amendment. And neither was the subsequent search, which occurred only once the parcel was reasonably deemed unclaimed or abandoned, for one

forfeits his Fourth Amendment privacy interest in property once he abandons it. *See United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004).

Defendant disputes the notion that the Postal Service "could," conforming with the Constitution, "treat this parcel as abandoned and open it without a warrant." (Doc. 406 at 8). He presses the longstanding proscription that sealed packages may be opened only under warrant. (Id. (first citing *Ex Parte Jackson*, 96 U.S. 727, 733 (1877); then citing *United States v. Van Leeuwen*, 397 U.S. 249, 251 (1970); and then citing 39 U.S.C. §404(c)). But Defendant does not explain how inspection of this parcel infringed on *his* Fourth Amendment rights. *See United States v. Payner*, 447 U.S. 727, 731 (1980) ("[A] court may not exclude evidence under the Fourth Amendment unless it finds that an unlawful search or seizure violated the defendant's own constitutional rights.").

"[T]he application of the Fourth Amendment depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). It is the defendant's burden to "establish[] that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

USPS's Criminal Investigations Service Center sent letters to the sender and recipient on May 11, 2021, neither responded, and the parcel was opened on June 18, 2021, more than six week later. (Doc. 394-2). Defendant does not attempt to show that he retained an expectation of privacy in this parcel, which was addressed neither to or from him and which had gone unclaimed following USPS inquiry, when it was opened. The court thus finds no basis on which to suppress this evidence.

### 2. Parcel 2 - Tracking No. EJ 629 673 027 US

This parcel, which was mailed from Phoenix, Arizona to a Pennsylvania "address associated with law enforcement," was seized pursuant to a controlled purchase of fentanyl by a confidential informant working with law enforcement officers. (Doc. 394 at 25). The government represents that the CI, in furtherance of law enforcement investigation, arranged to purchase pills from the sender, David Beckford, and sent money to Beckford.  (Id.). Beckford mailed the parcel to the requested address and gave the CI the Express Mail tracking number.

The government needed no warrant to search this parcel, for it was not intercepted during USPS delivery but sent directly to law enforcement. At that point, any legitimate expectation of privacy dissolved.

Because Defendant has not established that he had a legitimate expectation of privacy in this parcel, no violation of his Fourth Amendment rights occurred.

### 3. Parcel 3 - Tracking No. EJ 971 010 938 US

This parcel, sent from Phoenix and addressed to an individual in Wilkes-Barre, was searched pursuant to a search warrant issued by then-Chief Magistrate Judge (now United States District Judge) Karoline Mehalchick. (Doc. 394-4). The warrant was issued based on U.S. Postal Inspector Lauren Fetch's sworn affidavit averring that through her education and training she had become familiar with drug traffickers' use of parcel delivery services, that "fictitious names and addresses are often used by drug smugglers," and that a CLEAR database query revealed that the parcel's sender was not associated with its return address or any business records at all, and neither was the listed recipient associated with the delivery address. (Doc. 394-4). Inspector Fetch also averred that "[p]rior narcotics investigations have revealed the parcel's origin, Arizona, as a source location for narcotics distributed throughout the United States" and that the delivery was paid for with cash, which "is frequently used to mail parcels that contain narcotics because of the relative anonymity of the transaction." (Id.). She further averred, based upon her experience, that Priority Mail Express

is frequently used by drug traffickers because it does not require a signature upon delivery. (Id.). Inspector Fetch noted too that Parcels 1 and 2, which were also sent from Arizona to Wilkes-Barre, had recently been found to contain pills suspected of containing fentanyl, and that Parcel 1 had a similar weight to Parcel 3 and was sent to the same address. (Id)

Considering the above affidavit, the court concludes that reasonable suspicion existed to seize the parcel and that Judge Mehalchick had a substantial basis for concluding that probable cause existed to uphold the warrant. Therefore, this search was not in violation of the Fourth Amendment.

### 4. Parcel 4 - Tracking No. EJ 016 803 359 US

This parcel was sent from Phoenix, Arizona and addressed to Edwardsville, Pennsylvania. Postal inspectors detained the package and obtained a search warrant to open it. Again, the warrant was issued by Judge Mehalchick based on an affidavit by Inspector Fetch.

The affidavit included substantially the same indicia as were reported for Parcel 3, discussed above. Inspector Fetch additionally averred that Parcel 3 and Parcel 4 had similar weights and were mailed from the same Arizona zip code, and that a July 13, 2021 parcel sent to the same address as Parcels 1 and 3 had the same label sequence as Parcel 4, which is

"common," because suspects may "pick up a large quantity of Priority Mail Express Shipping labels at the same time."

Accordingly, the court concludes that reasonable suspicion to detain this package existed and that Judge Mehalchick had a substantial basis for finding probable cause. Therefore, no Fourth Amendment violation occurred here.

### 5.  Parcel 5 - Tracking No. El 263 948 851

The last parcel was also sent from Phoenix and addressed to Edwardsville, detained by postal inspectors, and searched pursuant to a warrant issued by Judge Mehalchick based on an Inspector Fetch affidavit. (Doc. 394-6). In addition to substantially the same indicia as reported for the previous two parcels, Inspector Fetch averred that Parcel 5 was mailed from the same location as Parcel 4, in which pills suspected to contain fentanyl were found, and that the two had similar weights and similar handwriting, including an uppercase "E" in "Phoenix" and "R" in "Edwardsville." (Id.). Considering these circumstances, the court concludes that reasonable suspicion existed to detain this parcel and that Judge Mehalchick had a substantial basis for finding probable cause. So no Fourth Amendment violation occurred.

Defendant takes issue with the Parcels 3–5 affidavits' incorporation of information regarding Parcels 1–2, which he regards as having been unconstitutionally seized. (Doc. 406 at 9). Because the court concludes that he has established no violation of his Fourth Amendment rights with respect to Parcels 1–2, it cannot conclude that the subsequent incorporation of that information gave rise to such a violation.

### 6. Conclusion

Because the court concludes that Defendant has established no violation of his Fourth Amendment rights, his motion to suppress will be denied.

**CONCLUSION**

For the foregoing reasons, Defendants Bell and Wigfall's motions to dismiss the informations of prior convictions will be granted. Defendants Bell and Jones's motion to compel, motion for discovery of co-conspirator statements, and motion for a *James* hearing will be denied. Finally, Defendant Bell's motion to suppress will be denied. An appropriate order will issue.


                    *s/ Malachy E. Mannion*
                    **MALACHY E. MANNION**
                    **United States District Judge**

**DATE: April 30, 2024**
23-26-01